**A F F I D A V I T**

STATE OF WEST VIRGINIA

COUNTY OF RALEIGH, to-wit:

I, Mark P Gunther II, being duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1.      This affidavit is made in support of an application for a search warrant to search the premises as more particularly described in Attachment A located at 111 Mool Avenue, Beckley, West Virginia (hereinafter referred to as "SUBJECT PREMISES") and used by KIMBERLY LOGAN (hereinafter referred to as "LOGAN") and TALBERT PANNELL III (hereinafter referred to as "PANNELL"). Based on the facts set forth herein, probable cause exists that evidence of violations of 21 U.S.C. §§ 841 - distribution of controlled substances and possession with intent to distribute controlled substances, 21 U.S.C. §§ 843(b) - use of a communication facility to facilitate drug trafficking, and 21 U.S.C. § 856 - maintaining a drug-involved premises, fruits of that criminal activity, and property designed for use, intended for use, or used to commit those offenses are currently located at the SUBJECT PREMISES.

2.      I have been employed as a Special Agent of the Federal Bureau of Investigation ("FBI") since May 2017, and I am currently assigned to the Beckley, West Virginia Resident Agency of

the Pittsburgh Division. Prior to my employment with the FBI, I was employed as a Deputy Sheriff with the Raleigh County, West Virginia Sheriff's Office for over nine years, including approximately three years as a detective. During my employment with the FBI, I have participated in many different types of criminal investigations including but not limited to kidnapping, bank robbery, other violent crimes, health care fraud, financial institution fraud, as well as matters relating to violent street gangs and criminal drug enterprises. In my capacity as an FBI Agent, I have received specialized training and/or have gained experience through everyday work in conducting these types of investigations. As part of my duties with the FBI, I investigate violations of federal law, including drug trafficking offenses enumerated in Title 21 U.S.C §§ 841, 843, and 856.

3. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. Among other duties, I am participating in an investigation relating to the distribution of controlled substances by LOGAN, PANNELL, RONALD LAVAUGHN MASON (hereinafter referred to as "MASON"), other persons known, and others yet unknown, in violation of 21 USC §§ 841(a)(1), 843(b), and 856, that is, distribution of controlled substances; use of a

communication facility to facilitate drug trafficking; and maintaining a drug-involved premises (hereinafter the "TARGET OFFENSES").

4. There is probable cause to believe that LOGAN, PANNELL, and MASON have committed, are committing and will continue to commit the TARGET OFFENSES. The information contained herein is based on my knowledge, training, and experience, my direct involvement in this investigation, and upon information relayed to me by other law enforcement agents, and other witnesses. Summaries of recorded conversations are based on draft transcriptions of those conversations. Because this Affidavit is being submitted for the limited purpose of seeking a search warrant for the SUBJECT PREMISES, I have not set forth each and every fact learned during the course of this investigation, but simply those facts which I believe are necessary to establish probable cause.

## BACKGROUND

5. The United States, including the FBI, is conducting a criminal investigation into a drug trafficking organization involving LOGAN, PANNELL, MASON, and other persons regarding the violation of the TARGET OFFENSES within the Southern District of West Virginia.

6. On May 6, 2024, the Honorable Thomas E. Johnston, United States District Court Judge for the Southern District of West

Virginia, entered an order authorizing the interception of wire communications over AT&T telephone number (681) 305-9553 (TARGET TELEPHONE #3). Interceptions are scheduled to expire on June 4, 2024.

7. On April 10, 2024, the Honorable Omar J. Aboulhosn, United States Magistrate Judge for the Southern District of West Virginia, signed a search warrant authorizing the installation and use of a tracking device on MASON's black Buick LaCrosse. Tracking of the vehicle is scheduled to end on May 25, 2024.

8. A controlled purchase of suspected fentanyl was made from LOGAN at the SUBJECT PREMISES, which is detailed later in this affidavit.

9. The controlled purchase was made utilizing a confidential informant. The confidential informant was provided with an amount of pre-recorded currency to utilize in the controlled purchase. The controlled purchases were surreptitiously audio and video recorded by a micro recording device provided to the confidential informant.

10. The confidential informant's person was searched prior to and after the controlled purchase to ensure that no controlled substances were present prior to the controlled purchase and that all controlled substances purchased were turned over to law enforcement.

BACKGROUND: ITEMS TO BE SEIZED

11. Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

a. Individuals involved in narcotics trafficking often maintain the following items in their residences: controlled substances and paraphernalia for packaging, weighing, cutting, testing, distributing and manufacturing controlled substances.

b. Individuals involved in narcotics trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time even after the debts are collected. I have found in my training and experience that such records are invaluable to narcotics traffickers and that such records are rarely discarded. Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers, and co-conspirators.

c.   Individuals involved in narcotics trafficking must often rely on others to obtain their drugs and to help them market the narcotics.  Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residence.

d.   Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits.  In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at residences of individuals involved in narcotics trafficking.

e.   Individuals involved in narcotics trafficking often keep and maintain large amounts of United States currency at their residences. Such funds are often used for everyday expenditures and to maintain and finance their ongoing narcotics business. Additionally, individuals involved in narcotics trafficking often amass and maintain assets at their residence which were generated by their trafficking activities or purchased with the cash earned from such trafficking.

f. Individuals involved in narcotics trafficking often maintain weapons, firearms, and ammunition on their person or in their residence and /or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms. Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their narcotics and firearms dealings.

g. Residences and premises used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting, or controlling the residence and premises.

h. Individuals involved in narcotics trafficking frequently communicate with co-conspirators by means of cellular telephones and electronic paging devices and usually maintain these items on their person and/or in their residences and vehicles.

i. Individuals involved in narcotics trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter-surveillance upon law

enforcement authorities, and usually maintain these items on their person and/or in their residences and vehicles.

j.  Individuals involved in narcotics trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with narcotics proceeds or property utilized to facilitate narcotics trafficking activities. Such items are typically maintained in their residences. Drug traffickers often store information relating to their drug trafficking business on cellular telephones, computers, and/or computer disks.

12.  It is also my opinion and belief that the above-described documents are currently possessed by narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by narcotics dealers whether or not the dealer is in possession of any drugs and chemicals at any given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found at the target location despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

13.  The investigation into the criminal activities of the above individual reveals that their drug distribution activities

are ongoing. Due to the quantities of narcotics being distributed and the relatively sophisticated manner in which the above individuals conduct their illegal activities, I believe they have been engaged in the illegal sale of narcotics for a long period of time. Based on my training and experience, I believe that the criminal activity described above is, by nature, self-perpetuating. Several of the participants involved in the drug distribution have been targets of law enforcement for several years. They have been arrested on drug distribution investigations in the past, but this has not deterred them from continuing in the business of drug trafficking and distribution. As a consequence, I believe that the items described in Attachment B will provide evidence of the events set forth in this affidavit and that such articles can be found at the SUBJECT PREMISES despite any lapse of time between the events described and the anticipated search pursuant to this warrant.

14.   The applied for warrant would also authorize the forensic examination of electronic devices, cellular telephones, and other devices capable of storing electronic information for the purpose of identifying electronically stored data described above and particularly described in Attachment B.

SEARCH PROTOCOL FOR CELLULAR TELEHONES AND ELECTRONIC DEVICES

15.   It is not possible to determine, merely by knowing a cellular telephone's make, model and serial number, the nature

and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular telephones today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini computers allowing for electronic mail services, web services and rudimentary word processing. Cellular service providers allow for their subscribers to access their device over the internet and remotely destroy all of that data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "airplane mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. Conversations can be hidden in various applications. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results

using digital photography. This process is time and labor intensive and may take weeks or longer.

## TECHNICAL TERMS

16. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Cellular telephone: A cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning

system ("GPS") technology for determining the location of the device.

## PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

17.  On April 10, 2024, a controlled purchase of suspected Fentanyl was made from LOGAN at the SUBJECT PREMISES. The operation resulted in the purchase of approximately 2 grams of a tan powder substance, suspected to be Fentanyl, from LOGAN for $120.00. The controlled purchase was made utilizing a confidential informant and was audio and video recorded. The purchase was arranged between the confidential informant and LOGAN utilizing Facebook Messenger. The substance purchased field tested positive for the presence of Fentanyl and was sent to the Drug Enforcement Administration Mid Atlantic Laboratory for confirmatory testing. The results of that test are pending.

18.  On May 9, 2024 at 8:07 PM, an LOGAN, on telephone number 304-575-1905, placed an outgoing call to MASON on TARGET TELEPHONE #3 (Session 00487). The following was discussed:

> LOGAN:  Alright, Ariel's okay, TJ got two forty, and I have uh, right now I got two ninety but it'll be, it'll be three forty, I got to get the money off my CashApp. But right now in my hand I got two ninety.

12

MASON:    Do the CashApp too because after this I got some other shit I to do.

LOGAN:    Oh so you're not ready yet?

MASON:    Yea I'm ready that's what I'm saying, I'm bout to after this.

LOGAN:    Oh, I thought you was gonna take me, you want to walk to the Dollar Store?

MASON:    Okay well we gonna walk on up there then.

PANNELL:  Tell him why don't he just go meet us at the end of the street

MASON:    No I'll take you, I thought you

LOGAN:    Oh, okay, alright

MASON:    So what he want all food or what?

LOGAN:    (To PANNELL) You want all food or what?

PANNELL:  (To LOGAN) I want food and crack.

LOGAN:    He want food and crack.

MASON:    What he want?  Three and a half?

LOGAN:    (To PANNELL) Three and a half?

MASON:    A three then a half.

LOGAN:    (To PANNELL) Or three then a whole?  Which one?

MASON:    No, I'm saying does he want three Gs then a half a G of hard?

PANNELL:  (On phone with MASON now) Hello?

13

MASON: What I'm saying is how you trying to spend it?

PANNELL: You know what I'm saying, I want the majority, uh, food.

MASON: Alright I'll give you uh, you say two forty?

PANNELL: Yes.

MASON: Yea I'll get you right.

PANNELL: It is what I said it is bro, I don't be meaning to do that shit bro. You know, I can tell you, you know, I can tell you.

MASON: I'm about to be on my way though.

PANNELL: Alright we gonna go ahead and start walking.

MASON: Alright, nah I'll take it up there.

PANNELL: Okay okay, alright brother.

MASON: Just give me like five minutes.

On May 9, 2024 at 8:14 PM, an LOGAN, on telephone number 304-575-1905, placed an outgoing call to MASON on TARGET TELEPHONE #3 (Session 00492). The following was discussed:

MASON: Yo.

LOGAN: Hey, did you get my text?

MASON: Ya.

LOGAN: OK. And um, I'm wit' Ariel walkin' um, to the dollar store now.

MASON: Aight. What you say 220?

14

LOGAN: Nah. I mean. I dunno? What, it was gonna be 240 for him so I dunno what he got.

MASON: Ya'll be playin' this way.

LOGAN: No. We ain't playin' but he always trynna get smart shit hey. You know what I'm sayin'? Bitch. I'm just trynna help you but get your own shit. Fuck him. You know?

MASON: Lemme. Sh... Damn. Man.

LOGAN: He's supposed to call you. He didn't call?

MASON: Nah.

LOGAN: [laughter] That bitch. Aight.

MASON: I ain't gonna, Tell him. I ain't gonna be bringing drugs just for nothin', man.

LOGAN: Ya. And why won't he call.

MASON: Imma see.

LOGAN: Aight.

MASON: Aight.

19. Based on my training, experience, and the investigation thus far, LOGAN was arranging a purchase of fentanyl and crack cocaine from MASON for PANNELL. ("So what he want all food or what?" "He want food and crack."). After some discussion, MASON asked if PANNELL wanted three grams of fentanyl and a half gram of crack cocaine ("No, I'm saying does he want three Gs then a half a G of hard?"), to which PANNELL said he wanted the majority

15

to be fentanyl ("You know what I'm saying, I want the majority, uh, food."). After discussing where they would meet, MASON said he would come to them ("Alright, nah I'll take it up there."). MASON then called LOGAN back to confirm amounts, ("Aight. What you say 220?") and LOGAN said that PANNELL was supposed to call MASON. When MASON said that PANNELL didn't call him, MASON asked LOGAN to tell PANNELL that MASON wasn't going to bring him drugs for nothing ("I ain't gonna... Tell him. I ain't gonna be bringing drugs just for nothin', man.").

20. Shortly after the previous call, at approximately 8:37 PM on the same date, the GPS tracker installed on MASON's vehicle showed the vehicle stop in the area of 111 Mool Avenue. I believe based on the previous that MASON brought the drugs that were being discussed to PANNELL and LOGAN at the SUBJECT PREMISES.

21. On May 21, 2024, law enforcement conducing surveillance in the area of the SUBJECT PREMISES observed PANNELL exit the residence and leave in a white Jeep Grand Cherokee.

22. On May 22, 2024 at 9:22 PM, LOGAN, on (304)575-1905, placed an outgoing call to MASON on TARGET TELEPHONE #3 (Session 02383). The following, in part, was discussed:

> LOGAN: Hey. Get uh, I'm ready. Are you coming out?
> MASON: Yea.
> LOGAN: OK. I'm comin' up from Raleigh.
> [Unintelligible]

16

| | |
|---|---|
| MASON: | Huh? |
| LOGAN: | I was gonna look at the moon. It's the full moon. |
| MASON: | Gimme like fifteen, twenty minutes. |
| LOGAN: | Okay. |
| MASON: | What are you guys going? |
| LOGAN: | Um.  Over at TJs. |
| MASON: | Ah.  OK.  I thought that you was going home. |
| LOGAN: | Ya. I am. What was it? |
| MASON: | Two five. |
| LOGAN: | Okay.  I have two twenty-five. |

On May 22, 2024 at 10:04 PM, LOGAN, on (304)575-1905, placed an outgoing call to MASON on TARGET TELEPHONE #3 (Session 02391). The following was discussed:

| | |
|---|---|
| MASON: | Hello? |
| LOGAN: | My phone been dead.  You ain't tried to call, have you? |
| MASON: | Nah. I just been waitin' on you. |
| LOGAN: | Ah. Shit. Okay. Um, I'm here, waitin' on you. |
| MASON: | Where you at? |
| LOGAN: | I'm at Mool. |
| MASON: | Aight. |
| LOGAN: | OK. |

On May 22, 2024 at 10:11 PM, an MASON, on TARGET TELEPHONE #3 (Session 02392), placed an outgoing call to LOGAN on (304)575-1905. The following, in part, was discussed:

LOGAN: Hello.

MASON: Hey, I'm coming. I'm just waiting on my people to call me back where I can go all at once. I'm coming though.

LOGAN: Okay.

MASON: I'm just lettin' you know. I, I, I'm not... I'm comin' though.

LOGAN: OK. Um. [simultaneous talking]

MASON: Aight.

LOGAN: OK.

MASON: Aight. It shouldn't be no more than about five or ten minutes.

On May 22, 2024 at 10:24 PM, an MASON on TARGET TELEPHONE #3 (Session 02395), placed an outgoing call to LOGAN on (304)575-1905. The following was discussed:

LOGAN: Hello?

MASON: Hey, be outside.

LOGAN: Okay.

23. Based on my training, experience, and the investigation thus far, I believe that LOGAN asked MASON if he was coming back out to deliver drugs ("Hey. Get uh, I'm ready. Are you

18

coming out?") to which MASON replied ("Yea.") and to give him fifteen or twenty minutes ("Gimme like fifteen, twenty minutes."). MASON asked LOGAN where he would meet her ("What are you guys going?") and LOGAN said they were going to PANNELL's house ("Um. Over at TJs."). LOGAN then asked MASON how much she would owe him for the drugs ("Ya. I am. What was it?") and MASON responded that it was ("two five") believed to be two hundred and fifty dollars. LOGAN told MASON she had two hundred twenty-five ("Okay. I have two twenty-five.)"

LOGAN then called MASON back and said her phone had been dead ("My phone been dead. You ain't tried to call, have you?"). MASON said he had been waiting on LOGAN and asked LOGAN where she was ("Nah. I just been waitin' on you." "Where you at?"). LOGAN responded that she was at the SUBJECT PREMISES ("I'm at Mool."), known to investigators to be 111 Mool Avenue, Beckley, West Virginia.

MASON then called LOGAN back and told her he was coming but was waiting on other customers to call him so he could do it all in one trip and would be five to ten minutes ("Hey, I'm coming. I'm just waiting on my people to call me back where I can go all at once. I'm coming though." "Aight. It shouldn't be no more than about five or ten minutes.").

MASON then called LOGAN to tell her to be outside because he was on his way to drop off the drugs ("Hey, be outside.").

## CONCLUSION

24. Based on the above-stated information, probable cause exists that LOGAN and PANNELL are engaged in drug trafficking activities in violation of (i) the distribution and possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1); (ii) 21 U.S.C. § 856 - maintaining a drug-involved premises; and (iii) use of a communications facility in facilitating the commission of the foregoing offenses, in violation of 21 U.S.C. § 843(b). Probable cause exists that evidence of those offenses, fruits of those offenses, and property designed for use, intended for use, or used to commit those offenses are currently located at the SUBJECT PREMISES as more fully described in Attachment A.

Further your affiant sayeth naught.

_____
Mark P Gunther II
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me by telephone this 28th Day of May, 2024.

_____
OMAR J. ABOULHOSN
UNITED STATES MAGISTRATE JUDGE